PRODUCER'S LIVESTOCK MARKETING ASSOCIATION, a Utah Cooperative Association, Plaintiff and Respondent,

v.

Zane CHRISTENSEN, Defendant and Appellant.

No. 15388.

Supreme Court of Utah.

Nov. 27, 1978.

---

6. U.C.A., 1953, 20–1–7.9.

Brent H. Wall and R. Earl Dillman, Salt Lake City, for defendant and appellant.

Ben E. Rawlings and James R. Morgan, Salt Lake City, for plaintiff and respondent.

ELLETT, Chief Justice:

This is an appeal from a money judgment for $50,235 in favor of plaintiff based on two drafts drawn on plaintiff by defendant. Defendant does not contest the judgment as to plaintiff's complaint, but asserts the district court erred in denying defendant relief on four counts of his counterclaim. The court awarded defendant $4,000 on count five of his counterclaim, which plaintiff does not dispute on appeal.

Because the dispute in this case centers around defendant's counterclaim, only the facts pertaining to it are set forth.

Since 1954 the plaintiff and defendant have engaged in joint ventures whereby the plaintiff would furnish the cash and the defendant would furnish the expertise and "know how" in buying, selling, feeding and manipulating cattle. When the defendant would finally dispose of the stock, adjustments would be made for interest on the money each had advanced, and the profits would be divided. This was the procedure until 1973 when the market price of cattle fell.

The defendant bought 2,282 head of cattle and paid for them with plaintiff's money in the amount of $611,605.38. This was exactly as he had done for many years prior thereto. The defendant sold 994 head of cattle for $237,429.05 and turned the money over to the plaintiff. The remaining 1,288 head were to be sold to another party, but he could not make contemplated arrangements to raise the necessary cash and so the sale to him did not materialize. The trial court, sitting without a jury found that the parties up to this point had acted as joint venturers.

The defendant always dealt with one J. L. Lindsay, the division manager of the plaintiff. Mr. Lindsay instructed the defendant to purchase the animals in question based upon defendant's own judgment. Despite the fact that both Lindsay and the defendant testified to the contrary the trial judge found that the joint venture ended at this point.

The price of cattle was falling and Lindsay and the defendant agreed that the stock should be placed in a feed lot until the next spring at which time they hoped and expected that they could sell the cattle and avoid a loss.

The defendant and Mr. Lindsay agreed that the cattle should be placed in a feed lot operated by Johnsons. Johnsons could not feed all of the herd so 86 calves were left on defendant's ranch. The defendant pursuant to the agreement placed the remainder of the herd with Johnsons under a written agreement whereby Johnsons would pay $250 per head and defendant would re-purchase the cattle the next spring for that sum plus 42¢ per pound of weight increase.

The Johnsons paid $283,500 upon delivery of the cattle which sum was delivered to the plaintiff by the defendant.

The situation then was:

| | | |
|---|---|---|
| Original cost of cattle | | $611,605.38 |
| Less sold to Waitt | $237,429.05 | |
| Cash from Johnsons | 283,500.00 | 520,929.05 |
| Cash paid by Plaintiff and not reimbursed | | $ 90,676.33 |

The price of cattle continued to fall drastically and the plaintiff on its books carried the un-reimbursed figure as an account receivable.

Mr. Lindsay, the division manager of plaintiff testified as follows:

A. . . . I told him to get the money gathered up and get it in. We were short of money.

Q. Why?

A. Why? Because it was going to get paid from Johnsons and I wanted the accounts receivable straightened up.

Q. Well why would you want to clean up the accounts receivable when they were Producers' cattle?

A. Well, Producers was participating in the buy-back just like Mr. Christensen was.

Q. Isn't it in fact that the reason Mr. Christensen paid that off is because he actually purchased those cattle?

A. No.

Q. Now what was the nature of your buy-back agreement with the Johnson Brothers?

A. The nature of the deal as I remember it, was so much a pound gained and a certain price. This was three or four years ago.

Q. Now why did you have a buy-back agreement with the Johnson Brothers?

A. Well, the Johnson Brothers wanted something to feed. They could raise the money and we thought the deal would be straightened out. Now that's why, no other reason.

Q. What was the nature of your relationship with Mr. Christensen as to the buy-back?

A. I told him we would participate.

Q. On what basis?

A. Oh, fifty-fifty is what the whole deal done.

Q. Did you have anything in writing on that?

A. No sir, we didn't have anything in writing on a lot of things that made money as well as losses.

Q. So at the point in time when those cattle were placed into the Johnson feedyard and that deal sheet is made up by Mr. Christensen paying it off, you consider that a sale?

A. I consider that a clean up.

Q. Well do you consider it a sale?

A. No.

Q. Doesn't a sale buy-back imply that that's a sale?

A. Well, I consider it a clean up of that particular deal to that point. And, Mr. Christensen knew that there was a loss there as well as I did and Mr. Christensen was wanting to get out of a loss just as well as Producers was. So consequently all I could tell you, is he cleaned the deal up. We knew we was going to have to settle up sooner or later.

Mr. Lindsay sent one of his employees down to check on the condition of the cattle in the feed lot. He testified as follows:

A. Well, of course, I hadn't seen the cattle for some time and I wanted to see what kind of flesh they were in. I wanted to have him take a look at them because we were trying to sell the cattle and we wanted to know what flesh they was in.

Q. Now, did you participate at all in the negotiations between the Johnson Brothers in the settling up of this account?

A. No.

Q. You left that completely to Mr. Christensen's discretion?

A. That's true.

Because Mr. Christensen at the request of Mr. Lindsay raised the $90,676.33 and paid it to the plaintiff to relieve it from financial distress the trial court thought that the joint venture was at an end and thereby saddled Mr. Christensen with all of the loss on the deal which amounted to $209,614.17.

Next spring because of financial distress Christensen made a different arrangement with the Johnsons and put up more of his own money to pay for the feed bill.

■ A joint venture should remain joint whether it results in a gain or in a loss, unless the parties otherwise contract. The record does not reveal any contract other than the joint venture. The loss in the instant matter resulted from the decline in the value of cattle together with the death of some animals. The defendant in attempting to avoid the loss to the venture, as was his duty, is entitled to be treated as a joint venturer and not to be saddled with the entire loss. The judgment is reversed and the case remanded to the trial court with directions to treat the matter as a joint venture; and to adjust the accounts to show the amount due each party for money advanced together with interest thereon and to divide the loss in the same proportion which over the years the parties have used in dividing the gains. The defendant should then have judgment against the plaintiff to equalize the loss between the

parties and the plaintiff should have the judgment reduced by the two drafts sued upon in the complaint together with interest thereon.

The appellant is awarded his costs.

CROCKETT and HALL, JJ., concur.

MAUGHAN, Justice (dissenting):

The main opinion fails to set forth all the facts necessary for an accurate picture of the events giving rise to this litigation; in addition, the opinion totally ignores our familiar and well-established rules of appellate review—which exist to prevent the exact action the majority takes in this case—in order to reach a result not supported by the preponderance of the evidence.[1]

The case was treated by both parties and the district court primarily as one for an accounting between "partners," and the court may thus invoke its equitable power to review both questions of law and fact.[2] But even under the standards for review of such cases, we should properly in this case affirm.

Fifty-five years ago, in *Olivero v. Eleganti*, 61 Utah 475, 214 P. 313 (1923), this court stated, "This court is authorized by the State Constitution to review the findings of the trial courts in equity cases, but the findings of the trial courts on *conflicting evidence* will not be set aside unless it manifestly appears that the court has *misapplied proven facts* or made findings *clearly against the weight of the evidence.*" (Emphasis added.) More recently, the court, in a unanimous opinion authored by Mr. Justice Hall, stated, "The long established rules of appellate review require this court to *defer to the findings of the fact finder rather than substitute our judgment therefor*, and such holds true *unless it can be determined as a matter of law that no one could reasonably find as did the fact finder.*" [3] (Emphasis added.) The opinion cites

*Hanover Limited v. Fields*, Utah, 568 P.2d 751 (1977), also a unanimous opinion, which notes, " . . . this court is constrained to look at the whole of the evidence *in the light favorable to the trial court's findings, including any fair inferences* to be drawn from the evidence and all of the circumstances shown. The trial court's findings shall not be disturbed unless the evidence is such that all reasonable minds would be persuaded to the contrary." (Emphasis added.) Speaking through Mr. Justice Crockett in *Hatch v. Bastian*, Utah, 567 P.2d 1100 (1977), another unanimous opinion, the court stated:

Even though we may review the evidence [in an equity case], the proposition is well grounded in our law that *due to the advantaged position of the trial court, we indulge considerable deference to his findings* and do not interfere with them unless the evidence so clearly preponderates against them that this court is convinced that a manifest injustice has been done. [Emphasis added.]

The facts in this case simply do not warrant a reversal under the rules given above.

Because several important factual aspects supporting the conclusions of the trial court have been omitted in the main opinion, the facts are summarized below.

Plaintiff is a cattle marketing association operating out of Davis County, Utah, and defendant is a rancher and cattle dealer in Duchesne County. They had dealt with each other regularly since 1948. Beginning in the 1950's, they often split profits on joint transactions, which usually consisted of defendant buying cattle from local ranchers with drafts drawn on plaintiff, and plaintiff then selling the cattle to third parties. Defendant kept a draft book, which was given him by plaintiff, and used it for thousands of purchases over the years. Both parties are licensed cattle deal-

---

1. It is important to note that the claim at issue here is defendant's counterclaim, and as such, defendant had the burden of persuasion, viz., of proving it by a preponderance of the evidence. *J. Henry Jones Company v. Smith*, 27 Utah 2d 225, 494 P.2d 526 (1972).

2. *West v. West*, 16 Utah 2d 411, 403 P.2d 22 (1965).

3. *Canesecca v. Carnesecca*, Utah, 572 P.2d 708 (1977).

ers, and the transactions between them can best be described as joint ventures, each party contributing money or services, with the goal of dividing profits when the cattle were resold.

Plaintiff maintains a "country division," over which one J. L. Lindsay was the manager until he was terminated in 1975. Defendant dealt exclusively with Lindsay in all transactions with plaintiff, and relied on Lindsay's determinations as to profit distributions. Lindsay allocated net profits between the parties considering factors such as the source of moneys used to purchase the cattle, the length of time required to complete the transaction, feed costs, freight charges and services rendered by each party. Lindsay and defendant shared in occasional losses, but generally enjoyed a profitable and harmonious relationship.

Cattle transactions were documented on plaintiff's "deal sheets," which indicated from whom the cattle were purchased, the number, kind and weights of cattle, the purchase price, associated costs and services, the ultimate buyer, and the final sales price. Because U.S. Department of Agriculture regulations forbade such dealers from splitting profits in this manner, the deal sheets typically indicated defendant's share of profits as "handling services."

In the fall of 1973, Lindsay and defendant discussed purchasing calves at the annual Ute Indian Tribe auction. The parties contemplated buying approximately 2,000 cattle and selling them to Waitt Cattle Company and one Carl Short. Pursuant to this plan, defendant successfully bid for 2,282 for a total price of $611,605.38, and issued plaintiff's draft as payment. Waitt Cattle Company purchased 994 of the cattle for $237,429.05; the remaining 1,288 could not be sold to Short as planned, however, because he was unable to arrange financing. Although both Lindsay and defendant testified they still acted in concert, the district court, which sat without a jury, found they ended the joint venture at this point and defendant assumed sole control over the cattle.

Beginning the same week as the Ute Indian cattle purchase, cattle prices experienced a severe and sudden decline, making it impossible to resell the cattle without a substantial loss. The court found that defendant, acting alone, placed most of the cattle in the Johnson Brothers' feed yards in Delta, Utah, in the hope the market would improve in coming months. The remaining 86 head were kept by defendant at his ranch in Duchesne, Utah. The Johnsons paid defendant $250 per head for the calves, pursuant to a written agreement between defendant and the Johnsons. The agreement provided that defendant would buy the cattle back in the spring for the same price plus 42¢ per pound for the total weight gain of the calves. Defendant accordingly received $283,500 from the Johnsons and in turn paid this sum to plaintiff, leaving $90,676.33 still owing plaintiff on the original draft. On March 13, 1974, defendant paid plaintiff that sum, and the transaction was closed, as far as plaintiff's deal sheet indicated.

Also that spring, defendant arranged with the Johnsons to buy back 322 of the cattle, pay the feed bill, and leave the remainder of the cattle with Johnsons. The evidence showed defendant paid Johnsons $102,900 for the cattle and a total of $86,946.98 for feed; these sums were not drafted on plaintiff, but came from a loan company and from defendant's own pocket. Defendant joined the 322 cattle with the 86 already on his ranch in Duchesne, and finally sold them in October, 1974 to a cattle producer named Wheat Heart Northwest for a net amount of $83,815.80. Defendant's total loss on the transaction was $209,614.17, one half of which he claims should be borne by plaintiff.

The district court held the payment by defendant to plaintiff on March 13, 1974 was the final settlement of the Ute Indian cattle transaction; it held defendant simply bought the cattle from plaintiff after Mr. Short was unable to perform. Defendant and Lindsay both testified to the contrary, asserting they participated in a joint venture, and that they intended to leave an accounting for the loss in the future. They

testified that the reason plaintiff was paid in full for the cattle was plaintiff was short in operating cash, and needed to reduce its accounts receivable.

The main opinion neglects to note that Lindsay was terminated for cause in 1975; because of this fact, coupled with the fact that Lindsay's testimony in his deposition was extremely favorable to defendant, and Lindsay and defendant had continued business relations with each other after Lindsay's termination, the district court held Lindsay to be an adverse witness to *plaintiff*. In addition, Lindsay's testimony was directly impeached by two of plaintiff's officers, who each testified Lindsay told them plaintiff had no partnership interest in the cattle after the sale of approximately one half the cattle to Waitt Company. The trial court obviously disbelieved and therefore discounted Lindsay's testimony, as is its prerogative when confronted with *conflicting* testimony such as in this case.

It is important to note that defendant's evidence as to the alleged joint venture consisted *entirely* of his own and Lindsay's oral testimony. The court, in its effort to discover the true state of affairs, was confronted not only with testimony seriously impeaching Lindsay's story, but with the actions of both Lindsay and defendant which contradicted their own claim. Lindsay himself admitted the management of plaintiff was never informed of any alleged partnership interest in the cattle until defendant pressed for a contribution in 1975. The "deal sheets" kept by plaintiff contained no indication the transaction was different from a regular purchase and sale. These sheets were relied upon by both parties in the past as binding and as noting the state of the account between plaintiff and defendant. Had there actually been a continuing arrangement between the parties in 1974, it is reasonable to expect plaintiff's obligation would have been noted on the deal sheet as an "account payable" to defendant for his "handling services."

Even more contradictory to defendant's theory is the whole transaction with the Johnson brothers, who fed the cattle that winter. They testified they dealt only with defendant; that no mention of plaintiff or Lindsay was made; and that, contrary to Lindsay's assertion, they remembered no person sent by Lindsay to examine the cattle in the spring. The written agreement which provided for the sale and subsequent repurchase of the cattle by defendant made no mention of Lindsay or plaintiff, and was signed only by defendant and the Johnsons. Especially damaging to defendant's theory is the fact that in the spring of 1974, defendant paid the Johnsons approximately $190,000 (for feed costs and to repurchase 322 cattle) *out of his own pocket and with a loan from a third company*, despite having in his possession plaintiff's draft book which he was free to use. This, combined with trucking costs and the $90,676.33 defendant paid to plaintiff as payment on plaintiff's original draft, makes a total of approximately $294,000 which defendant personally paid for cattle allegedly owned equally by himself and plaintiff. Significantly, plaintiff, which usually financed the joint ventures, was fully reimbursed on the original draft and did not pay one dollar to the Johnsons or anyone else. The court below could have easily concluded defendant would not have incurred such a burden had he and plaintiff actually been joint venturers, especially in light of defendant's continued possession of plaintiff's draft book.

Finally, evidence before the court indicated defendant sold the cattle with plaintiff acting as a broker in October, 1974. Defendant received the proceeds, minus an $800 sales commission to plaintiff. No evidence indicates plaintiff had any interest in the cattle at that point, and in fact, when shown the deal sheet on the Wheat Heart Northwest sale, *Lindsay had no knowledge of what the transaction represented*, other than it being a sale of defendant's cattle. Had the parties at this point actually been participating in a joint venture, it seems incredible Lindsay would not have recognized the sale to Wheat Heart Northwest as the culmination of the transaction.

In sum, considering the fact 1) Lindsay's termination provided him with an obvious

motive for testifying unfavorably against plaintiff, 2) his testimony was seriously impeached in critical points, 3) the documentary evidence (upon which both parties relied in all their past transactions) indicated defendant simply purchased the cattle from plaintiff, and 4) both Lindsay's and defendant's actions contradicted their testimony, the trial had more than enough competent evidence before it to support its ruling. As an appellate court, we have no business usurping the role of the fact-finder in adjudging the credibility of witnesses. Under our rules of review, it simply cannot be said the court's findings are against the weight of the evidence, and, in such a case, we must affirm.

WILKINS, J., concurs in the views expressed in the dissenting opinion of MAUGHAN, J.